*301 AGEE, Circuit Judge,
with whom Judge NIEMEYER, Judge TRAXLER, Judge SHEDD, and Judge DIAZ join, dissenting:
The majority holds that the- Rowan County Board of Commissioners’ practice of opening its public meetings with a commissioner-led invocation violates the Establishment Clause. That decision is irreconcilable with Marsh v. Chambers, 463 U.S. 783, 103 S.Ct. 3330, 77 L.Ed.2d 1019 (1983), and Town of Greece v. Galloway, 672 U.S. —, 134 S.Ct. 1811, 188 L.Ed.2d 835 (2014). Therefore, I respectfully dissent.

I.

[1]

Rowan County, North Carolina, exercises its municipal power through an elected Board of Commissioners (“the Board”), which typically holds public meetings twice a month. For many years, the Board has permitted each commissioner, on a rotating basis, to offer an invocation before the meetings.[2]
'Typically, the Board chair would call the meeting to order and invite the other commissioners and public audience to stand for the ceremonial opening. A designated commissioner would then offer an invocation of his or her choosing followed by thé Pledge of Allegiance. The content of each invocation was entirely in the discretion of the respective commissioner; the Board neither composed the prayer nor policed its content. The prayers frequently, though not invariably, invoked the Christian faith. For example, after beginning the prayers with some variant of “let us pray” or “please pray with me,” the prayer givers often referred to “Jesus,” “Christ,” and “Lord.” E.g., Suppl. J.A. 36-37.[3] Although not required to do so, most of the public audience joined the commissioners in standing for the invocation and the Pledge of Allegiance. Once this ceremonial part of the meeting concluded, the Board turned to its public business.
Rowan County residents Nancy Lund, Liesa Montag-Siégel, and Robert Voelker (collectively, “Plaintiffs”) filed a complaint in the U.S. District Court for the Middle District of North Carolina “to challenge the constitutionality of [the Board’s] practice of delivering sectarian prayer at meetings.” J.Á. 10. Plaintiffs alleged that the prayer practice unconstitutionally affiliated the Board with one particular faith and caused them to feel excluded as “outsiders.” J.A 12. In addition, they alleged that the overall atmosphere was coercive, requiring them to participate so they “would not stand out,” Suppl. J.A. 2, or otherwise be singled out in a manner they speculated might negatively affect business before the Board.
Plaintiffs sought a declaratory judgment that the Board’s prayer practice violated the Establishment Clause, along with an injunction preventing- any similar future prayers. Plaintiffs successfully obtained a preliminary injunction based on now-abrogated case law from this Court which had held that sectarian legislative prayer-violated the Establishment Clause. See Joyner v. Forsyth Cty., 653 F.3d 341, 348 (4th Cir. 2011) (explaining that our decisions “hewed to [the] approaeh[ of] approving *302 legislative prayer only when it is nonsectarian in both policy and practice”), abrogated by Town of Greece, 134 S.Ct. 1811. The Supreme Court then issued its decision in Town of Greece, which held that sectarian legislative prayer was constitutional. 134 S.Ct. at 1815, 1820, 1824.
In the wake of Town of Greece, the parties filed cross-motions for summary judgment. Although the district court granted the Plaintiffs’ motion, it first recognized that Town of Greece “repudiated” and “dismantl[ed] the Fourth Circuit’s legislative prayer doctrine [that had] developed around the core understanding that the sectarian nature of legislative prayers was largely dispositive” of its constitutionality. Lund v. Rowan Cty., 103 F.Supp.3d 712, 719, 721 (M.D.N.C. 2015). Nonetheless, the district court concluded that “[sjeveral significant differences” between Toum of Greece and this case—including the identity of the prayer givers and the invitation to the public to stand—rendered the Board’s practice unconstitutional. Id. at 724.
II.
As the majority acknowledges, this ease requires a case-specific evaluation of all the facts and circumstances. See Lynch v. Donnelly, 465 U.S. 668, 678-79, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984) (observing that the Establishment Clause cannot be applied mechanistically to draw unwavering, universal lines for the varying contexts of public life). Those facts and circumstances must be viewed through the lens of the Supreme Court’s prior legislative prayer decisions, including both its broader explications of what legislative prayer practices are permissible and its narrower applications of those principles to the facts presented in those cases. So, before turning to the facts and circumstances of this case, it’s important to review the first principles from Marsh and Town of Greece.
Though legislative prayer is government speech touching on religion, Turner v. City Council of Fredericksburg, 534 F.3d 352, 354 (4th Cir. 2008), the Supreme Court has not relied on traditional Establishment Clause analysis to assess its constitutionality. See Marsh, 463 U.S. at 792, 103 S.Ct. 3330. Legislative prayer is its own genre of Establishment Clause jurisprudence, assessed under a different framework that takes the unique circumstances of its historical practice and acceptance into account. See Town of Greece, 134 S.Ct. at 1818 (“Marsh is sometimes described as ‘carving out an exception’ to the Court’s Establishment Clause jurisprudence, because it sustained legislative prayer without subjecting the practice to any of the formal tests that have traditionally structured this inquiry.”).
The Supreme Court first articulated this approach in Marsh, which involved a challenge to the constitutionality of the Nebraska legislature’s practice of having a paid chaplain offer a prayer to open each legislative session. Recounting the longstanding American tradition of opening legislative sessions with prayer, the Supreme Court traced the history of legislative prayer “[f]rom colonial times through the founding of the Republic and ever since.” Marsh, 463 U.S. at 786, 103 S.Ct. 3330.
The Court ascribed particular significance to the views of the First Congress, which, “as one of its early items of business, adopted the policy of selecting a chaplain to open each session with prayer.” Id. at 787-88, 103 S.Ct. 3330. The Senate and House, in turn, appointed official chaplains in 1789. Id. at 788, 103 S.Ct. 3330. Placing great significance on these events, the Court explained those acts reflected how legislative prayer fit into the Found *303 ers’ understanding of the Establishment Clause: “It can hardly be thought that ... they intended the Establishment Clause ... to forbid what they had just declared acceptable.” Id. at 790, 103 S.Ct. 3330. “This unique history [led the Court] to accept the interpretation of the First Amendment draftsmen who saw no real threat to the Establishment Clause arising from [the] practice of [legislative] prayer[.]” Id. at 791, 103 S.Ct. 3330.
Having upheld the constitutionality of legislative prayer in general, the Marsh Court next considered whether Nebraska’s practice fell within the bounds of the First Amendment. In particular, the Court considered the plaintiffs specific challenges to three characteristics of Nebraska’s legislative prayer practice: (1) the State had selected a representative of “only one denomination” for sixteen years; (2) the chaplain was a paid state employee; and (3) his prayers were offered “in the Judeo-Christian tradition.” Id. at 792-93, 103 S.Ct. 3330.
The Court rejected each claim. First, the Court observed that the First Congress “did not consider opening prayers as a proselytizing activity or as symbolically placing the government’s official seal of approval on one religious view.” Id. at 792, 103 S.Ct. 3330. Next, it noted that there was no evidence that the chaplain’s long tenure “stemmed from an impermissible motive,” and thus his continuous appointment did “not in itself conflict with the Establishment Clause.” Id. at 793-94, 103 S.Ct. 3330. That the chaplain was paid from public funds was similarly “grounded-in historic practice” and thus not prohibited. Id. at 794, 103 S.Ct. 3330. Lastly, as for the content of the prayers, the Court explained it was “not of concern” because “there is no indication that the prayer opportunity has been exploited to proselytize or advance any one, or to disparage any other, faith or belief.” Id. at 794-95, 103 S.Ct. 3330. Accordingly, the Court declined “to parse the [prayer] content.” Id. at 795, 103 S.Ct. 3330.
In County of Allegheny v. ACLU Greater Pittsburgh Chapter, 492 U.S. 573, 578-79, 602, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989), a case about the constitutionality of two religious holiday displays located on public property, the Court referred in dicta to its prior holding in Marsh, observing that “[t]he legislative prayers involved in Marsh did not violate [the Establishment Clause] because the particular chaplain had removed all references to Christ.” Id. at 603, 109 S.Ct. 3086. In additional dicta, the Court observed that “not even the unique history of legislative prayer can justify contemporary legislative prayers that have the effect-of .affiliating the government. with any one specific faith or belief.” Id.
Whatever fleeting persuasiveness that dicta merited, the Supreme Court unequivocally rejected it in Town of Greece. There, the Court explicitly disavowed any constitutional requirement that legislative prayers be nonsectarian to comply with the Establishment Clause: “An insistence on nonsectarian or ecumenical prayer as a single, fixed standard is not consistent with the tradition of legislative prayer outlined in [our] cases.” Town of Greece, 134 S.Ct. at 1820.
The Town of Greece, New York, Board opened its monthly legislative meetings with an invocation delivered by volunteer clergy. Guest chaplains were found by placing calls to congregations listed in a local directory. Id. at 1816. Nearly all of these churches were Christian, as were the guest clergy. Most of the invocations referenced the Christian faith, but the Town Board was not aware of the prayer content beforehand, nor did it attempt to edit the content of the prayer or otherwise instruct *304 the prayer giver - on what to. say. Id..Though the Second Circuit concluded that this “steady drumbeat of Christian prayer ... tended to affiliate the town with Christianity,” in violation of the Establishment Clause, the Supreme Court disagreed. Id. at 1818.
The Supreme Court explained that Marsh instructed that the constitutionality of a legislative prayer practice must be considered in light of “historical practices and understandings.” Id. at 1819; accord id. at 1818-19. A practice is constitutional so long as it “fits within the tradition long followed ½ Congress and the state legislatures” because “[a]ny test [we] adopt[ for analyzing invocations] must acknowledge á practice that was accepted by the Framers and has withstood the critical scrutiny of time and political change.” Id.
The Court rejected the plaintiffs’ argument that legislative prayer must be to a generic god or otherwise nonsectarian to pass - muster under the Establishment Clause by focusing on three principles:'the Framer’s understanding of legislative prayer, the historical place legislative prayer occupies in society, and avoiding official government entanglement in crafting the-content of prayers. In addition, the Court recognized that legislative prayer historically served a ceremonial function “at the opening of legislative sessions, where it is meant to lend gravity .to- the occasion and reflect values long part of the Nation’s heritage." Id. at 1823. Observing first that legislative invocations containing explicitly religious themes were accepted at the time of the First Congress and. remained vibrant throughout American history to modern times, the Court concluded, “[a]n insistence on nonsectarian or ecumenical prayer as a single, fixed standard is not consistent with [our accepted] tradition of legislative prayer.” Id. at 1820. On this point, the Court specifically disavowed Allegheny’s “nonsectarian” interpretation of Marsh as. dictum “that was disputed when written and has been repudiated by later cases,” Id. at 1821; see also id, (“Marsh nowhere suggested that the constitutionality of legislative prayer turns on the neutrality of its content.”).
The Court further observed that a content-based rule “would force the legislatures that sponsor prayers and the courts that are asked to decide these cases to act as supervisors and censors of religious speech.” Id. at 1822. Enforcing specific content restrictions would “involve government in religious.matters to a far greater degree than is the case under the town’s current practice of neither editing or approving prayers in advance nor criticizing their content after the fact.” Id. “Once it invites prayer into the public sphere,” the Court stated, “government must permit a prayer giver to address his or her own God or gods as conscience dictates, unfettered by what an administrator or judge considers to be nonsectarian.” Id. at 1822-23,
Synthesizing these factors, the Court fashioned three, distinct, but related, holdings. First, the Court held that the years of prayers offered on behalf of the Town of Greece, although almost exclusively Christian, did not evince a pattern of denigration (of non-Christian faiths) or proselytization (to bolster Christianity). Although some prayers arguably contained proselytizing or disparaging content, the Court concluded that the practice as a whole served only to solemnize the board meetings. In other words, a few questionable prayers were of no constitutional consequence. Id. at 1824.
Second, the Court determined to be of no moment the fact that the invited prayer givers were predominantly Christian; “[s]o long as the town maintains a policy of nondiscrimination, the Constitution does not require it to search beyond its borders *305 for non-Christian prayer givers in an effort to achieve- religious balancing.” Id. Continuing, the Court observed
[t]he quest to promote a diversity of religious views would require the town to make wholly inappropriate judgments about the number of religions it should sponsor and the relative frequency with which it should sponsor each, a form of government entanglement with religion that is far more troublesome than the current approach.

Id.

Third, the Court rebuffed the plaintiffs’ contention that the prayers unconstitutionally “coerce[] participation by nonadherents.” Id. (Kennedy, J., plurality opinion). The Court acknowledged that “coercion” could render legislative prayer beyond constitutional protection in some outlying circumstances, such as “[i]f the course and practice over time shows that the invocations denigrate nonbelievers or religious minorities, threaten damnation, or preach conversion.” Id. at 1823 (majority opinion). And although Justices in the majority differed in their approaches, the Court nonetheless rejected the plaintiffs’ argument that coercion arose from either the context of a local municipal government meeting, or the prayer givers’ invitation that others could stand or join in the prayer. Compare id. at 1824-28 (Sec. II.B of Justice Kennedy’s plurality opinion), with id. at 1837-38 (Sec. II of Justice Thomas’s concurring opinion).
Justice Kennedy, joined by Chief Justice Roberts and Justice Alito, framed the coercion inquiry as “a fact-sensitive one that considers both the setting in which the prayer arises and the audience to whom it is directed.” Id. at 1825 (plurality opinion). These Justices found no coercion in Greece’s prayer practice, relying heavily on the historical approach of Marsh. They presumed that reasonable observers are aware of the multiple traditions acknowledging God in this country, including legislative prayer, the Pledge of Allegiance, and presidential prayers. They concluded that, because of these traditions, citizens could appreciate the Town’s prayer practice without being compelled to participate. Id. Further, they observed that the prayers served a non-religious purpose: putting legislators in a contemplative state of mind and connecting them to the historical tradition of their forerunners. Id. at 1826. Justice Kennedy made clear that “[o]ffense ... does not equate to coercion." Id. He observed that “[ajdults often encounter speech they find disagreeable,” even in a legislative forum, but that does not give rise to an Establishment Clause violation. Id. Instead, the historical acceptance of legislative prayer recognizes that “citizens, firm in their own beliefs, can tolerate and perhaps appreciate a ceremonial prayer delivered by a person of a different faith.” Id. at 1823 (majority opinion).
Justice Thomas, joined by Justice Scalia, interpreted the Establishment Clause to prohibit only “actual legal coercion,” which they defined as the exercise of “government power in order to exact financial support of the church, compel religious observance, or control religious doctrine.” Id. at 1837 (Thomas, J., concurring in part and concurring in the judgment). As no evidence of actual legal coercion existed in this case, they concurred in the. Court’s judgment. Id. at 1837-38,
As this review of Marsh and Town of Greece confirms, our nation’s long historical tradition of welcoming and encouraging legislative prayer gives the practice a unique place in Establishment Clause jurisprudence. It requires a different legal analysis than' other types of government conduct touching on religion. The majority muddies the distinct analysis required in this type of Establishment Clause case, *306 relying on more general principles applicable in other Establishment Clause contexts to avoid the clear legal principles set out in Marsh and Town of Greece.[4] While lower court judges may personally disagree with the principles the Supreme Court pronounces, they are not at liberty to ignore or dilute them. DIRECTV, Inc. v. Imburgia, 577 U.S. —, 136 S.Ct. 463, 468, 193 L.Ed.2d 365 (2015) (reiterating that although “[l]ower court judges are certainly free to note their disagreement with a decision of this Court,” they.are nonetheless bound to follow those decisions); United States v. Taylor, 754 F.3d 217, 223 (4th Cir. 2014) (Wilkinson, J.) (“[W]e shall follow the plain lessons of Supreme Court cases ..., which must of necessity govern our disposition of this case”).
III.
The majority points to “the combination of [four] elements” that render the Board’s prayer practice unconstitutional: (1) “commissioners as the' sole prayer-givers”; (2) “invocations that drew exclusively on Christianity and sometimes served to advance that faith”;- (3) “invitations to attendees to participate”; and (4) “the local government setting.” Majority Op. 280-81. But a proper application of the principles of Marsh and Town of Greece to the Board’s prayer practices leads to the opposite conclusion. Indeed, the Supreme Court has already addressed three of the four factors the majority relies on, and has explained why they do not serve as a basis for an Establishment Clause violation. The only new feature in this case is the identity of-the prayer giver. But—for the reasons explained below—that single characteristic does not remove the Board’s practice from the protected scope of Marsh and Town of Greece. In short, the majority wrongly concludes that the sum of the parts is greater than the whole—that is, that the four factors they present, which standing alone are undoubtedly constitutional, somehow combine to. render the Board’s legislative prayer practice unconstitutional.
Curiously, the majority accuses the dissents of lacking “any sense of balance.” Majority Op. 278. Even more curiously, it suggests we fail to “consider the prayer practice ... holistically.” Majority Op. 289. However, the majority’s invocation of balancing factors and viewing otherwise valid principles “holistically” in order to reach a preferred result is no camouflage for its lack of merit. In short, the majority misapplies Town of Greece’s assessment of how the factors are to be evaluated both individually and in tandem.
As we’ve set out at great length, the only factor that distinguishes this case from Mcursh or Town of Greece is that, here, an individual commissioner gives a prayer on a rotating basis. We conclude that factor does not skew the totality of the circumstances to make Rowan County’s practice unconstitutional. We then recount why the remaining aspects of the County’s practice align with the practices previously approved of—in the aggregate—in Marsh and Town of Greece. That *307 is precisely the sort of analysis Marsh and Town of Greece require.
A.
Town of Greece instructs that the constitutionality of legislative prayer hinges on its historical roots. Because' legislative prayer has been a constant and recognized part of civic life for more than two centuries, it “has become part of the fabric of our society.” Town of Greece, 134 S.Ct. at 1819. Hence, if a prayer practice has long been “followed in Congress and the state legislatures,” courts must view it as “a tolerable acknowledgement of beliefs widely held” by people in the United States. Id. at 1818-19; see also id. at 1819 (observing that prayer practices “accepted by the Framers and [which have] withstood the critical scrutiny of time and political change” must not be “swe[pt] away” because doing so “would create new controversy and begin anew the very divisions along religious lines that the Establishment Clause seeks to prevent”).
The majority gives this principle only a curt nod before decrying the Board’s practice of lawmaker-led legislative prayer as “unprecedented.” Majority Op. 277. That conclusion cannot withstand review.
1.
Straightaway—and without any legal support for doing so—the majority attaches near-dispositive meaning to the fact that lawmakers, as opposed to clergy, gave the legislative prayers at issue in this ease. While both Marsh and Town of Greece considered prayers given by clergy, the. distinction between state-selected clergy prayer, on the one hand, and lawmaker-led prayer, on the other, is a distinction without a difference. Neither Marsh nor Town of Greece attached particular significance to the identity of the speakers. Moreover, the tradition and history of lawmaker-led prayers is as prevalent as that of other legislative prayer givers. Thus, contrary to the majority’s suggestion, the fact that the Supreme Court has not specifically addressed lawmaker-led prayer signifies nothing. Could it simply be that until recently, no one since. 1788 had conceived that legislators leading legislative prayers for legislators was outside the historical tradition “followed in Congress and the state legislatures”? Town of Greece, 134 S.Ct. at 1819. Contra Majority Op. 278 (“The conspicuous absence of case law on lawmaker-led prayer is likely no accident.”).[5]
The Supreme Court’s analysis of legislative prayer in Marsh and Town of Greece did not look to the speakers’ identities; instead, the Court confined its discussion to the circumstances of the prayer practices before it. See Town of Greece, 134 S.Ct. at 1820-28; Marsh, 463 U.S. at 786-95, 103 S.Ct. 3330. Nowhere did the Court say anything that could reasonably be construed as a requirement that outside or retained clergy are the only constitutional source of legislative prayer. Quite the opposite, Town of Greece specifically directs courts’ focus to what has been done in “Congress and the state legislatures” without limitation regarding the officiant. 134 S.Ct. at 1819. Far from suggesting that this case falls outside the scope of Marsh or Town of Greece, the Supreme Court’s silence on the issue of lawmaker-led prayer is simply that: silence. See United *308 States v. Stewart, 650 F.2d 178, 180 (9th Cir. 1981) (remarking it would be improper to draw any inference from the Supreme Court’s silence on an issue not placed before it).
Nor has this Court previously assigned weight to the identity of the prayer giver. To' the contrary, we have suggested that the speaker’s identity is irrelevant. For example, in Wynne v. Town of Great Falls, 376 F.3d 292 (4th Cir. 2004), we remarked that “[p]ublic officials’ brief invocations of the Almighty before engaging in public business have always, as the Marsh Court so carefully explained, been part of our Nation’s history.” Id. at 302. Similarly, Joyner v. Forsyth County, 653 F.3d 341 (4th Cir. 2011), observed that “[i]t [is] the governmental setting for the delivery of sectarian prayers that courted constitutional difficulty, not those who actually gave the invocation.” Id. at 350; see also id. at 351 (“Once again, the important factor was the nonsectarian nature of the prayer, not the identity of the particular speaker.”). And in Simpson v. Chesterfield County Board of Supervisors, 404 F.3d 276 (4th Cir. 2005), we noted that the Supreme Court, “neither in Marsh nor in Allegheny, held that the identity of the prayer-giver, rather than the content of the prayer, was what would affiliate the government with any one specific faith or belief.” Id. at 286. Although these cases ultimately turned on the now-rejected position that sectarian prayer was constitutionally invalid, none made the prayer giver’s identity a factor in, let alone dispositive of, its analysis.
That conclusion makes sense given that legislative prayer constitutes a form of government speech regardless of the identity of the speaker; otherwise, it would not implicate the Establishment Clause at all. See, e.g., Snyder v. Murray City Corp., 159 F.3d 1227, 1238 (10th Cir. 1998) (Lucero, J., concurring in the judgment) (recognizing that “chaplains speak for the legislature”). Practically speaking, the public is unlikely to draw any meaningful distinction between, a state-paid chaplain (Marsh) or state-invited cleric (Town of Greece) and members of the legislative body that appoints him. These invited officiants are in essence “deputized” to speak on behalf of the governing body. Cf. Town of Greece, 134 S.Ct. at 1850 (Kagan, J., dissenting). Yet the practice was constitutional, even when those officiants aligned with a particular religion and were paid with state funds. Because a paid or invited officiant stands on the same footing as the legislar tors, it follows that elected representatives may also be their own prayer givers. And when they take on that role, their religious preference in the ceremonial invocation is no different than the state-sponsored clergy in Marsh and Town of Greece. The Supreme Court directly observed in Town of Greece that a purpose of legislative prayer was to allow législators to “show who and what they are” through their prayers. Id. at 1826 (plurality opinion). It thus makes abundant common and constitutional sense that legislators aré ideally suited to offer meaningful, heartfelt prayer to the audience of those prayers: their fellow legislators. Id. at 1825.
On a broader level, the very “history and tradition” anchoring Town of Greece underscores a long-standing national practice of legislative prayer generally and lawmaker-led prayer specifically. Opening invocations offered by elected legislators have long been accepted as both a mainstay of civic life and a permissible form of religious observance. See S. Rep. No. 32-376, at 4 (1853) (commenting that the authors of the Establishment Clause “did not intend to prohibit a just expression of religious devotion. by the legislators of the nation, even ini their public character as legislators” (emphasis added)); see also *309 Lynch, 465 U.S. at 674, 104 S.Ct. 1355 (“There is an unbroken history of official acknowledgment by all three branches of government of the role of religion in American life from at least 1789.”). As just one example, the South Carolina Provincial Congress—South Carolina’s first independent legislature—routinely welcomed an elected member to deliver invocations. See, e.g., South Carolina Provincial Congress, Thanks to the Continental Congress (Jan. 11, 1775), http://amarch.lib.niu.edu/ islandora/object/niu-amarch%3A94077 (last visited May 23, 2017) (saved as ECF opinion attachment), These early public pronouncements are important evidence demonstrating that lawmaker-led legislative prayer was viewed no differently from legislative prayer as a whole. To conclude otherwise is to impugn the practical wisdom of the Framers—a factor that weighed heavily in Town of Greece—and to suggest “the founders of the United States were unable to understand their own handiwork.” Myers v. Loudoun Cty. Pub. Sch., 418 F.3d 395, 404 (4th Cir. 2005).
Equally troubling, the majority turns a blind eye to the prevalence of lawmaker-led legislative prayer. A majority of states and territories honor requests from individual legislators to give an opening invocation. See Nat’l Conference of State Legislatures, Inside the Legislative Process 5-151 to -152 (2002), http://www.ncsl.org/ documentsAegismgt/ILP/02Tab5Pt7.pdf (observing legislators may offer an opening prayer in at least thirty-one states). Lawmaker-led prayer is especially prevalent in the states under our jurisdiction, where seven of the ten legislative chambers utilize elected members for this purpose. See id.; Br. of Amici Curiae State of West Virginia et al. Supporting Def.-Appellant at 14 & Add. 2-8; see also Office of Speaker Pro Tern Paul Stam, Prayers Offered in the North Carolina House of Representatives: 2011-2011, - http:// nchousespeaker.com/docs/opehing-prayers-nchouse-2011-2014,pdf (last visited May 23, 2017). Several of these states have enacted legislation recognizing and protecting the historical practice of lawmaker-led prayer. For example, a Virginia statute protects legislators who deliver a sectarian prayer during deliberative sessions. See Va. Code Ann. § 15.2-1416.1. And South Carolina expressly authorizes its elected officials to open meetings with prayer. See S.C. Code Ann. § 6-l-160(B)(l), Other states inside and outside our jurisdiction rely exclusively on lawmaker-led prayers. See, e.g., Mich. H.R. Rule 16 (requiring the clerk of the Michigan House of Representatives to “arrange for a Member to offer an invocation” at the beginning of each session); Nat’l Conference of State Legislatures, supra, at 5-152 (the Rhode Island Senate); Kate Havard, In delegates they trust: Md. House members lead, secular prayer, Wash. Post (Mar. 9, 2013), https://www. washingtonpost.com/local/md-politics/in-delegates-they-trust-md-house-members-lead-secular-prayer/2013/03/09/571fef8e-810 a-lle2-8074b26a871bl65a_story.html.
Lawmaker-led prayer finds contemporary validation in the federal government as well. Both houses of Congress allow members to deliver ah opening invocation. The congressional record is replete with examples of legislators commencing legislative business with a prayer. See, e.g., 161 Cong. Rec. S3313 (daily ed. May 23, 2015) (prayer by Sen. James Lankford); 159 Cong. Rec. S3915 (daily ed. June 4, 2013) (prayer by Sen. William M. Cowan); 155 Cong. Rec. S13401 (daily ed. Dec. 18, 2009) (prayer by Sen. John Barrasso); 119 Cong. Rec. 17,441 (1973) (prayer by Rep. William H. Hudnut III); see also 2 Robert C. Byrd, The Senate 1789-1989: Addresses on the History of the United States Senate 305 (Wendy Wolff ed., 1990) (“Senators have, from time to time, delivered the prayer.”).
*310 Particularly relevant to this case, lawmaker-led prayers frequently accompany the opening of local governmental meetings. See, e.g., Br. of Amici Curiae State of West Virginia et al. Supporting Def.-Appellant at 24-26 & Add. 11-43. In many localities, those prayers are exclusively lawmaker-led. See id.; see also Suppl. Br. of Amici Curiae State of West Virginia et al. Supporting Def.-Appellant Seeking Reversal at 9-10 & A10-A54.
In view of this long and varied tradition of lawmaker-led prayer, any wall barring elected legislators from religious invocations runs headlong into the Supreme Court’s acknowledgement that “[a]ny test [we] adopt[ ] must acknowledge a practice that was accepted by the Framers and has withstood the critical scrutiny of time and political change.” Town of Greece, 134 S.Ct. at 1819. As Justice Alito aptly explained, “if there is any inconsistency between any [Establishment Clause] test[] and the historic practice of legislative prayer, the inconsistency calls into question the validity of the test, not the historic practice.” Id. at 1834 (Alito, J., concurring). The majority’s conclusion strikes down a legislative prayer practice that is “part of the fabric of our society.” Id. at 1819 (majority opinion).
2.
The majority couples its angst about the identity of the prayer giver in this case with “legislators [being] the only eligible prayer-givers.” Majority Op. 278. That again is a fact without constitutional significance. The fact that the overwhelming majority of the prayers represented the Christian faith stems not from any “aversion or bias on the part of town leaders against minority faiths,” Town of Greece, 134 S.Ct. at 1824, but from the composition of the Board. Town of Greece made clear that the Constitution does not require the government actively court religious balance “[s]o long as the town maintains a policy of nondiscrimination.” Id.; see also Pelphrey v. Cobb Cty., 547 F.3d 1263, 1281 (11th Cir. 2008) (“[Marsh] does not require that all faiths be allowed the opportunity to pray. The standard instead prohibits purposeful discrimination.”).
There is no indicia of discrimination in this record. None. Nor is there any suggestion that the Board has or would bar any commissioner from offering a prayer faithful to the commissioner’s own traditions, regardless of his or her faith. Without such evidence, we cannot conclude that the Board’s prayer practice unconstitutionally limits the universe of prayer givers in violation of the Establishment Clause.
The majority implicitly acknowledges the lack of evidence in the record on this point, and so instead faults the Board’s “rigid, restrictive” prayer practice as contrasted with the “flexible, inclusive approach upheld in Town of Greece.” Majority Op. 282. That widely misses the point.
Marsh and Town of Greece were both acceptable legislative prayer practices, but neither imposed a fixed standard for the nature or number of prayer givers that would be constitutional. Just because the Supreme Court has upheld a more “flexible, inclusive approach” does not mean that other, more structured approaches are thereby unconstitutional. If anything, the prayer practice here is far more “inclusive” and multi-faceted than the one the Supreme Court approved in Marsh, with only one prayer giver from one faith tradition. See infra. Sec. II. Moreover, while Town of Greece’s practice resulted in a larger population of prayer givers, the majority elevates diversity to be the sine qua non of constitutionality. See Majority Op. 281-82 (citing the need for a constitutional practice to “embrac[e] religious pluralism and the possibility of a correspondingly *311 diverse invocation practice,” and considering whether a particular prayer practice could be more welcoming or do more to “cultivate[ ] an atmosphere of greater tolerance and inclusion”); see also Majority Op. 286 (expounding that “legislative prayer gives voice to the ecumenical dimensions of religious faith”). But Marsh and Town of Greece do not require enforced ecumenicalism nor do they demand denominational diversity; indeed, the Supreme Court expressly distanced itself from such a requirement. E.g., Town of Greece, 134 S.Ct. at 1824 (rejecting the view that lawmaking bodies must “promote a diversity of religious views”). Instead, the Court focused on whether the legislature’s practice—whatever that practice might be— evinces an unlawful discriminatory motive. Here, the record reflects none.
In short, the Supreme Court’s prohibition on discrimination in this context is aimed at barring government practices that result from a deliberate choice to favor one religious view to the exclusion of others. As explained in Town of Greece, concerns arise only if there is evidence of “an aversion or bias on the part of town leaders against minority faiths” in choosing the prayer giver. Id. The Marsh Court likewise alluded to this requirement when it cautioned that the selection of a guest chaplain cannot stem from “an impermissible motive.” 463 U.S. at 793, 103 S.Ct. 3330. This parameter is directed at the conscious selection of the prayer giver on account of religious affiliation or conscious discrimination against a prayer giver due to a religious affiliation. See id. Because there’s no evidence of either in this record, the limited-universe of prayer givers does not violate the principles espoused in Marsh and Town of Greece.
In another misreading of Supreme Court precedent, the majority contorts
Marsh to foster its novel rule mandating a broad universe of eligible prayer givers. A contextual review of Marsh leads to the opposite conclusion: the Nebraska legislature paid the same Presbyterian minister to offer prayers for sixteen years. 463 U.S. at 785, 793, 103 S.Ct. 3330. In rejecting the argument that this closed universe of prayer givers created a constitutional concern, the Supreme Court observed, “[ajbsent proof that the chaplain’s reappointment stemmed from an impermissible motive, we conclude that his long tenure does not in itself conflict with the Establishment Clause.” Id. at 793-94, 103 S.Ct. 3330. While it is true that other individuals occasionally substituted for the Nebraska chaplain, the fact remained that the overwhelming majority of prayers during that sixteen-year period were given by a single state-paid prayer giver from a single faith tradition. Even so—and entirely consistent with the Court’s later statements in Town of Greece—that fact did not give rise to a constitutional concern because there was, as here, no evidence of an impermissible motive. 134 S.Ct. at 1824. Marsh’s facts and holding stand for the principle that the selection of a single legislative prayer giver, or a limited set of prayer givers, who represent a single religious tradition does not advance any one faith or belief over another. See 463 U.S. at 793, 103 S.Ct. 3330 (“We cannot, any more than Members of the Congresses of this century, perceive any suggestion that choosing a clergyman of one denomination advances the beliefs of a particular church.”); Ctr. for Inquiry, Inc. v. Marion Circuit Court Clerk, 758 F.3d 869, 874 (7th Cir. 2014) {“Marsh and Greece show that a government may, consistent with the First Amendment, open legislative sessions with Christian prayers while not inviting leaders of other religions[.]”).
A fortiori, Town of Greece does not support the majority’s expansive view. Not *312 only are the legislators themselves the intended “congregation” for legislative prayer, Town of Greece, 134 S.Ct. at 1825 (plurality opinion), but the Supreme Court has recognized that legislative prayer practices carry - special meaning to 'the thousands- of local and state “citizen representatives” throughout this country. In fact, the Supreme Court in Town of Greece specifically acknowledged “members of town boards and commissions, who often serve part-time and as volunteers,” were lawmakers for whom “ceremonial prayer may ... reflect the values they hold as private citizens.” Id, at 1826. To repeat an earlier observation, if legislative prayer particularly reflects the values of “citizen representatives,” then it stands to reason that thése “citizen representatives” should be able to lead prayers in a way that connects with their intended audience: themselves. Id. Legislators are uniquely qualified to offer uplifting, héartfelt prayer on matters that concern themselves and their colleagues.
These precepts also demonstrate why lawmaker-led prayer does not, as the majority misconstrues, violate the principle that governments not be in the business of “composting] official prayers.” Compare. Majority Op. 281 (quoting Lee v. Weisman, 505 U.S. 577, 588, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992)), with Town of Greece, 134 S.Ct. at 1822 (observing that requiring prayers to be nonsectarian “would involve government in religious matters to a far greater degree than is the case under the town’s current practice of neither editing or approving prayers in advance nor criticizing their content after the fact” (emphasis added)).
Here, the Board’s practice does not. venture into impermissible writing or editing of religious speech. Rather, each commissioner gives his or her own prayer without oversight,, input, or direction from the Board, which does not supervise or censor the speech of its individual commissioners in crafting the prayers. Indeed, there is no evidence that the Board, as a Board, had any role in any of the prayers given by any of the indiyidual commissioners. The record is devoid of any suggestion that any prayer in this case is anything but a personal creation of each commissioner acting in accord with his or her personal views. As a consequence, each commissioner is essentially a free agent no different from the ministers in Town of Greece or the paid chaplain in Marsh, who gave invocations of their own choosing. Contrary to the majority’s conclusion, the' Board’s practice does not present the same concerns as when the “government [attempts] to define permissible categories of religious speech.” Town of Greece, 134 S.Ct. at 1822 (emphasis added). Instead, the Board’s legislative prayer practice amounts to nothing more than an- individual commissioner leading a prayer of his or her own choosing. .
For all these reasons, the majority errs in concluding that commissioners delivering the ceremonial prayer to open a Board meeting is a relevant distinguishing feature for the constitutional analysis set out Marsh and Town of Greece.[6]
*313 B.
As the identity of the legislative prayer givers at issue has no cognizable constitutional significance in this case, I turn next to the remaining characteristics of the Board's prayer practice discussed by the majority: content, coercion, and local government setting. Although the Supreme Court has not forged a comprehensive template for all acceptable legislative prayer, its decisions set out guideposts for analyzing whether a particular practice goes beyond constitutional bounds. See Snyder, 159 F.3d at 1233 (“Marsh implicitly acknowledges some constitutional limits on the scope and selection of legislative prayers[.]”).
1.
As the majority points out, one of the guideposts to acceptable legislative prayers is the content of those prayers. After reaffirming the holding in Marsh that lower courts should refrain from becoming embroiled in review of the substance of legislative prayer, Town of Greece noted that there.could be certain sectarian actions that might cause a legislative prayer practice to fall outside constitutional protection, such as “[i]f the course and practice over time shows that the invocations denigrate nonbelievers or religious minorities, threaten damnation, or preach conversion.” 134 S.Ct. at 1823. In that circumstance, the Court observed, “many present may consider the prayer to fall short of the desire to elevate the purpose of the occasion and to unite lawmakers in their common effort,” Id.
To this end, courts .need only assure themselves that sectarian legislative prayer, viewed from a cumulative perspective, is not being exploited to, inter alia, proselytize or disparage. Less egregious conduct warrants no. further review. Indeed, the Supreme Court has disclaimed any interest in the content of legislative invocations, announcing a strong disinclination “to embark on a sensitiye . evaluation or to parse the content of a particular prayer.” Marsh, 463 U.S. at 795, 103 S.Ct. 3330. The record in this case demonstrates that the Board’s prayer practice did not stray across the constitutional line of advancement,. proselytization, or disparagement. In fact, the prayers here are much further from that line than those before the Supreme Court in Marsh and Town of Greece.
To reach the opposite conclusion, the majority selectively quotes a handful from the hundreds of prayers offered in Board meetings to demonstrate what it perceives to be impermissible “promotion” of Christianity. E.g., Majority Op. 283-86. But in so doing, the majority untethers Town of Greece’s broader analysis from the specific prayers at issue in that case which the Supreme Court necessarily found did not cross any constitutional line. Even a cursory comparison shows that the prayers highlighted by the majority have less questionable language than, that contained in the prayers upheld in Marsh and Town of Greece.
The content of the commissioners’ prayers largely encompassed universal themes, such as giving thanks and requesting divine guidance in deliberations, much in line with the prayers challenged in Town of Greece. Cf. Town of Greece, 134 S.Ct. at 1824 (noting the prayers “invoked universal themes, as by celebrating the changing of the seasons or calling for a ‘spirit of cooperation’ among town leaders”). References to exclusively Christian concepts typically consisted of the opening or closing line, such as “In Jesus’ name. Amen,” exactly as in most prayers in Town of Greece. Compare Suppl. J.A. 29-31, tvith Town of Greece, 134 S.Ct. at 1824 (noting a “number of the prayers did invoke the *314 name of Jesus, the Heavenly Father, or the Holy Spirit”).
The invocation delivered at the Board’s October 17, 2011, meeting illustrates what Board members and the public would typically hear:
Let us pray. Father we do thank you for the privilege of being here tonight. We thank you for the beautiful day you’ve given us, for health and strength, for all the things we take for granted. Lord, as we read in the paper today, the economic times are not good, and many people are suffering and doing without. We pray for them; we pray that you would help us to help. We pray for the decisions that we will make tonight, that God, they would honor and glorify you. We pray that you would give us wisdom and understanding. We’ll thank you for it. In Jesus’ name. Amen.
Suppl. J.A. 31.
Some of the commissioners’ prayers contained more direct references to Christian teachings, but so did the prayers in Town of Greece. E.g., Majority Op. 283-86 (quoting prayers from the record). For example, the following prayers in Town of Greece gave the Supreme Court no pause, but would be anathema and forbidden under the majority’s reasoning:
• “Let us pray.... Lord this evening we ask you especially to bless [the new fire marshal and police captain]. Fill their hearts Lord with zeal to serve your people, and Lord we ask you to bless us all, that everything we do here tonight will move you to welcome us one day into your kingdom as good and faithful servants. We ask this in the name of our brother Jesus. Amen.” Joint Appendix, Town of Greece v. Galloway, 134 S.Ct. 1811 (2014) (No. 12-696), 2013 U.S. S. Ct. Briefs LEXIS 3132, at *34.
• “[W]e acknowledge the role of the Holy Spirit in our lives and that while there is a variety of gifts, there is always the one and the same spirit working in different ways in different people.... We pray this evening for the guidance of the Holy Spirit as the Greece Town Board meets.... Praise and glory be Yours oh Lord. Now and forever. Amen. Let’s just say the Our Father together. Our Father who art in Heaven, hallowed by [sic] thy name, thy kingdom come, thy will be done, on Earth as it is in Heaven, give us this day, our daily bread, forgive us our trespasses, as we forgive those who trespass against us, and lead us not into temptation, but deliver us from evil for thine is the kingdom, and the power, and the glory forever and ever.” Amen.” Id. at *49.
• “Would you bow your heads with me as we invite the Lord’s presence here tonight? Gracious Lord, we thank you so much for this opportunity to come together, to plan, to build, to establish direction for this fine community. And Lord, we acknowledge tonight that without your help, without your grace, without your wisdom, we’d probably make a mess of things.... Direct, guide, lead and establish your will.” Id. at *66.
• “Join me in prayer, if you would please.... My sister doesn’t get to live in a town where there’s a supervisor and councilmen that are God-fearing people.... Lord, may we not take the freedoms, the privileges, the opportunity that we have for granted.... I pray, Father, that they might remember to look to your word for wisdom and direction. And Father that you would help us to *315 keep you first and foremost in our lives and in our minds. We thank you for what you have done. In Christ’s name I pray. Amen.” Id. at *78-79.
• “Our Father, we know that you are sovereign over all creation. You are sovereign over this world. You are sovereign over this town. And Lord, you have placed these men and women as your servants to serve you first of all and then to serve this town and the people that live in this town, and so I pray that for them, they would have the attributes of godly leaders that would serve well.... Lord help them to stand up for those things that this town would be blessed because of godly leadership, of leadership that does right, that this town would flourish because it reflects the kingdom of God where things are done in order. And so I bring them before you. I pray that the proceedings tonight and through this year would reflect who you are and how you are leading, for I pray it in the name of your son Jesus Christ. Amen.” Id. at *89-90.
• “Let us pray. Lord, God of all creation, we give you thanks and praise for your presence and action in the world. We look with anticipation to the celebration of Holy Week and Easter. It is in the solemn events of next week that we find the very heart and center of our Christian faith. We acknowledge the saving sacrifice of Jesus Christ on the cross. We draw strength, vitality, and confidence from his resurrection at Easter. Jesus Christ, who took away the sins of the world, destroyed our death, through his dying and in his rising, he has restored our life. Blessed are you, who has raised up the Lord Jesus, you who will raise us, in our turn, and put us by His side.” Id. at *91.
• “Let’s pray. Father, we acknowledge that all authority and power resides [sic] in you. So as we come before you this evening, I pray for the men and women who sit behind me. I pray that they would acknowledge that you are the supreme ruler of all and that any authority they have, any rulership they have, is granted to them by you, by your sovereign will.” Id. at *92-93.
• “Lord, you are a mighty and awesome God, the ruler of the nations, the king of the earth, and all authority, whether wielded in state, or in home, or in church, is derived from you as a stewardship.... You are also a wise God, oh Lord, as seen in the world around us, and as evidenced even in the plan of redemption that is fulfilled in Jesus Christ.... We ask these things in the name of the Lord and Savior Jesus Christ, who lives with you and the Holy Spirit, one God for ever and ever. Amen.” Id. at *104-05.
• “Lord God of all creation, we give you thanks and praise for your presence and action in the world. We are approaching the end of the Easter Season [indiscernible] Easter, the ascension of the Lord on Thursday, this week, coming at the end of the forty days of Jesus Christ’s resurrection appearances, and with the Feast of Pentecost ten days later, on Sunday, May the 31st. The beauties of spring—the flowers, the blossoms, the fresh green on the trees, and the warmer weather—are an expressive symbol of the new life of the risen Christ. The Holy Spirit was sent to the apostles at Pentecost so that they would be courageous witnesses of the Good News to different re *316 .gions of the Mediterranean world and beyond. The Holy Spirit continues to be the inspiration and the source of strength .and virtue, which we all need in the world of today.... We pray this evening for the guidance of the Holy Spirit as the Greece Town Board meets.” Id. at *148-50.
The' prayers in Marsh invoked similarly pointed Christian themes, none of which caused any constitutional question in the Supreme Court’s view. For example, one prayer contained the following language:
Father in heaven, the suffering and death of your son brought life to the whole world moving our hearts to praise your glory. The power of the cross reveals your concern for the world and the wonder of Christ crucified.
The days of his life-giving death and glorious resurrection are approaching. This is the hour when he triumphed over Satan’s pride; the time when we celebrate the great event of our redemption.
We are reminded of the.price he paid when we pray with the Psalmist[,]
at which point the chaplain quoted from Psalm 22. Marsh, 463 U.S. at 823 n.2, 103 S.Ct. 3330 (Stevens, J., dissenting). And in a prayer offered before Easter one year, the Nebraska chaplain prayed, “Today as we are about to celebrate the great Holy Days of Christians and Jews, Holy Week and Passover, let us be reminded again through the faith and beliefs of our religions of the principles and directives which should guide us.... May these Holy Days, then, enable us to act as .true followers of the beliefs which we have and may it find expression in every act and law that is passed.” Joint Appendix at 108, Marsh v. Chambers, 463 U.S. 783 (1983) (No. 82-23), quoted in Snyder, 159 F.3d at 1234 n.11.
In short, the prayers actually offered in Marsh.and Town of Greece contained the same sort of .pleas to the Christian God and to Jesus Christ, the same recognition of a Christian tenet of salvation and dependence on God’s favor, and the same generalized exhortations to obedience to Christian teachings as those prayers singled out for concern by the majority. If the prayers in Marsh and Town of Greece did not independently merit concern as to content, then neither do the prayers offered in Rowan County.
Contrary to the majority’s consternation, the prayers in the case at bar do not, taken together, refléct a pattern of proselytizing any more than those in Town of Greece or Marsh. The majority’s examples merely reflect sectarian themes that hew to Christian doctrines. Other examples assume that the audience agrees with the prayer givers’ words or already shares a Christian viewpoint. Proselytization, in contrast, “means to seek to ‘convert’ others to” “a particular religious belief,” Wynne, 376 F.3d at 300, meaning that it seeks a change from one view to a different one. But the prayers by the commissioners never explicitly or implicitly ask the hearers to change beliefs, to. adopt as true any principles of the Christian faith, or anything else traditionally understood to be words imploring conversion. In addition, none of the prayers here threaten damnation to those of different faiths, belittle or chastise dissenters, or denigrate any other religious viewpoints. See, e.g., Snyder, 159 F.3d at 1235 (finding the plaintiffs proffered prayer unconstitutional because it “strongly disparage[d] other religious views” and “s[oughtj to convert his audience”).
Notably, although the. majority concludes that the prayers “suggested] that other faiths are inferior,” it does not point to'any language from the prayers maligning non-Christian beliefs. See Majority Op. 285, At most, it subjectively intuits the prayers “implicitly signaled disfavor to *317 ward non-Christians” whenever they “portray[ed] the failure to love Jesus or follow his teachings as spiritual defects.” Majority Op. 285. That conclusion contradicts Town of Greece’s direct instruction that legislative prayers can be sectarian, and thus espouse Christian or other faith teachings. Distilled, the majority holds that any time a legislative prayer contains sectarian language favoring one belief it implicitly signals disfavor toward sects that do not adhere to that belief. But that cannot be what Town of Greece meant by denigrating other faiths because it expressly held that sectarian prayers do not cross this line.
Stripped of these considerations, what remains are passing references in only some of. the prayers at issue that—at worst—merely approach the line drawn in Town of Greece. Given their paucity against the entire record, however, the prayers in this case easily meet the test articulated in Town of Greece, which held that a few stray remarks are insufficient to “despoil a practice that on the whole reflects and embraces our tradition” of legislative prayers. 134 S.Ct. at 1824. Or, to use Town of Greece’s other admonition, even if certain phrases in a handful of prayers are questionable, the practice at issue as a whole does not show “a pattern of prayers that over time, denigrate, proselytize, or betray an impermissible government purpose,” a legal condition precedent to any claim of a constitutional violation. Id.
Nor do the number of. sectarian prayers and period of time at issue change the analysis. Town of Greece’s reference- to a “pattern of prayers ... over time” must be understood in the context of that case. The period at issue there was 1999 to 2010, which encompassed some 120 monthly meetings, and for all but the last three years in that , record, the prayers were offered solely from a Christian tradition. Even during those last three years, only four prayers were given from a non-Christian faith tradition. Id. at 1839 (Breyer, J., dissenting). If those circumstances did not constitute an impermissible pattern of prayers that advanced Christianity or.otherwise crossed the . line, - neither do the facts of this case.
Here,' the complaint- challenged -the Board’s prayer practice from November 2007 through March 2013, a much shorter period of time than that covered in Town of Greece, though the meetings occurred twice a month rather than monthly. Suppl. J.A. 12-38. The majority notes that “97% of the Board’s prayers mention[] ‘Jesus,’ ‘Christ,’ or the ‘Savior.’ ” Majority Op. .273. Thus, in both Town of Greece and here, the prayers skewed heavily toward the Christian faith. Yet Greece’s prayer practice was not the ecumenical utopia the majority paints in order to cast Rowan County’s practice in a more negative light. Viewed against the facts of Town of Greece, the Board’s practice crossed no constitutional line.
The same cannot be said of the majority’s review of the- Board’s practice: by engaging in such detailed parsing of both the words! of individual prayers and the percentages of sectarian versus non-sectarian prayers, the majority violates the Supreme Court’s instruction that courts should not be the “supervisors and censors of religious speech.” Town of Greece, 134 S.Ct. at 1822. In other words, “[o]nce it invites prayer into the public sphere, government must permit a prayer giver to address his or her own God or gods as conscience dictates, unfettered by what an administrator or judge considers to be nonsectarian.” Id. at 1822-23 (emphasis added).
The majority appears to prefer the pre-Town of Greece principle that legislative prayers must consist of generic, nonsecta- *318 rían prayers that appease the broadest audience while offending the least. E.g., Majority Op. 284 (“[I]n considering whether government has aligned itself -with a particular religion, a tapestry of many faiths lessens that risk whereas invoking only one exacerbates it.”); Majority Op. 286 (“At its best, legislative prayer gives voice to the ecumenical dimensions of religious faith.”); Majority Op. 289 (“The ultimate criterion is simply one of conveying a message of respect and welcome for persons of all beliefs and adopting a prayer practice that advances the core idea behind legislative prayer, that people of many faiths may be united in a community of tolerance and devotion.”). The majority’s trouble with the ceremonial legislative prayer here thus stems from its disagreement-with the basic holding of Tom of Greece. But that disagreement cannot alter our role, as we are bound to faithfully apply the law articulated by the Supreme Court. ARA Servs., Inc. v. NLRB, 71 F.3d 129, 138 (4th Cir. 1995) (Motz, J., concurring in part and dissenting in part) (“[Disagreement provides no basis for refusing to follow a directive of the Supreme Court[.]”). That is judicial review run amok, particularly in a context where the Supreme Court has exhorted restraint.
One of the majority’s recurring themes is that if Rowan County’s legislative prayer practice is constitutional, there would be no limits to the constitutionality of legislative prayer. E.g., Majority Op. 290-91. Not so. As the above analysis observes, the Board’s practice adheres to the constitutional limits set out in Marsh and Town of Greece. This conclusion does not ignore the boundaries both cases set for practices that would cross a constitutional line. For example, prayers that implored the audience to attend a particular church would violate Town of Greece’s admonition that a prayer practice should not, over time, proselytize. Prayers that exhorted the hearers to renounce their faith tradition would similarly transgress this line. So, too, one can easily understand Town of Greece’s concern that a legislative body could not, in fact, make official decisions based on whether a member of the public participated in, or voiced opposition to, the legislative prayer practice. Contrary to the majority’s hyperbole, concluding that the prayer practice at issue in this case is constitutional does not leave Town of Greece’s boundaries meaningless; far from it.
2.
The majority also finds constitutionally significant that the legislative prayer at issue here occurs before local government meetings as opposed to state or federal legislatures. See Majority Op. 287-89. Rather than following Town of Greece’s instructive analysis, the majority instead muses about local government meetings as different than other legislative entities. For example, it notes that “[r]elative to sessions of Congress and state legislatures, the intimate setting'of a municipal board meeting presents a heightened potential for coercion” because, inter alia, citizens routinely come directly before the board. Majority Op. 287. It also observes that the “Board exercises both legislative authority ... [and] quasi-adjudicatory power.” Majority Op. 288. And it fears “the intimacy of a town board meeting may push attendees to participate in the prayer practice in order to avoid the community’s disapproval,” or so “they would not stand out” just prior to the Board considering their petitions. Majority Op. 288. In so doing, the majority draws on an argument posited by the petitioners in Tom of Greece and firmly rejected by the Supreme Court.
*319 Specifically, in Town of Greece the petitioners asserted that
the intimate setting of a town board meeting differs in fundamental ways from the invocations delivered in Congress and state legislatures, where the public remains segregated from legislative activity and may not address the body except by occasional invitation. Citizens attend town meetings, on the other hand, to accept awards; speak on matters of local importance; and petition the board for action that may affect their economic interests, such as the granting of permits, business licenses, and zoning variances.... [T]he fact that board members in small towns know many of their constituents by name only increases the pressure to conform.
134 S.Ct. at 1824-25 (plurality opinion). In concluding none of these points affected the constitutionality of Greece’s prayer practice, the Supreme Court plurality considered both the history and purpose of legislative prayer.
First, the plurality measured legislative prayer “against the backdrop of historical practice.” Id. at 1825. As discussed above, lawmaker-led legislative prayer is part and parcel of the same historical roots as legislative prayer more broadly. Infra Sec. III. A.l. Similarly, prayers at local government meetings are as historically rooted as prayers at the state and federal levels. Id.; see also infra Sec. II (discussing Town of Greece).
Next, the plurality noted that “[t]he principal audience for these invocations is not, indeed, the public but lawmakers themselves.” Town of Greece, 134 S.Ct. at 1825 (plurality opinion). In fact, the plurality found that legislative prayer has a particularly meaningful personal connection “[f]or members of town boards and commissions, who often serve part-time and as volunteers," precisely because it “refleet[s] the values they hold as private citizens. The prayer is an opportunity for them to show who and what they are without denying the right to dissent by those who disagree.” Id. at 1826. That the Supreme Court lauded the opportunity legislative prayer afforded local lawmakers to express their values highlights the majority’s perplexing conclusion here that prayer practices at the local level are actually more suspect. For the majority, it’s as if Town of Greece never happened.
Of course, this is not to say that legislative prayers cannot be coercive. But as the Town of Greece plurality recognized, “if town board members directed the public to participate in the prayers, singled out dissidents for opprobrium, or indicated that their decisions might be influenced by a person’s acquiescence in the prayer opportunity,” then coercion may exist. Id. (emphasis added). But the record here is devoid of those features.
For example, the record does not show that the Board ever ordered public participation in its prayer services. Instead, the record presents precisely the sort of procedure the Supreme Court approved in Town of Greece, There, “board members themselves stood, bowed their heads, or made the sign of the cross during the prayer, [but] they at no point solicited similar gestures by the public.” Id, There’s no evidence in the record before this Court that any of the commissioners ever commanded or demanded the public audience to rise or bow their heads, make the sign of the cross, or otherwise make any symbol of religious expression during the prayer. And while the Board extended the courtesy to those in attendance by inviting them to stand,- there’s no evidence that anyone was required to do so. Tellingly, the Plaintiffs’ own evidence shows portions of the public audience simply chose not to participate. See J.A. 12 (noting only “most” *320 of the audience stood). That a simple invitation to join—-which the audience was free to reject—could be twisted into coerced participation in a religious act distorts the record. Instead, lower courts, including this one, must take the Supreme Court’s counsel to heart and safely assume .that mature adults can follow contextual cues without the,risk of religious indoctrination. See Marsh, 463 U.S. at 792, 103 S.Ct. 3330; Town of Greece, 134, S.Ct. at 1823 (“[A]dult citizens, firm in their .own beliefs, can tolerate and perhaps appreciate a ceremonial prayer delivered by a person of a different faith.”).
In Town of Greece, the prayer givers often asked the audience “to rise for the prayer” by extending invitations such as “Would you bow your heads with me as we invite the Lord’s presence here tonight?”; “Let its join our hearts and minds together in prayer”; and “Would you join me in a moment of prayer?” 134 S.Ct. at 1826 (plurality opinion). Here, the designated commissioner would similarly offer a ceremonial invocation that typically started with “let us pray” or “please pray with me.” Such transitional and prefatory courtesy hardly constitutes coercion under the Supreme Court’s guidance. No case, before or- after Town of Greece, stands for that principle. To the contrary, for coercion to be found the government must “orchestrate[] the performance of a formal religious exercise in'a fashion that practically obliges the involvement of non-participants.” Myers, 418 F.3d at 406; And in the-context of legislative prayer, coercion must be measured “against the backdrop of historical practice” in which reasonable, observers are deemed to be familiar with the tradition and purpose of a ceremonial prayer to open a legislative session. Town of Greece, 134 S.Ct. at 1825 (plurality opinion). Viewed through that lens, no reasonable person would interpret a commissioner’s commonplace and “almost reflexive” opening line of “let -us pray” to compel their submission to the prayer. Cf. id. at 1832 (Alito, J., concurring). Such standard openings have been routinely offered for over two centuries in the U.S. Congress, the state legislatures, and countless local bodies. In short, such innocuous language cannot be what the. Supreme Court contemplated when it expressed concern about prayer givers “directing] the public to participate in the prayers.” Id. at 1826 (plurality opinion).
Plaintiffs, the district court, and the majority assert that the Board’s prayer practice made audience members feel subjectively “excluded at meetings” and that the Board’s “disagreement with [their] public .opposition to sectarian prayer could make [them] less effective advocatefs].” See Lund, 103 F.Supp.3d at 715-16. This is a failed argument. Town of Greece explicitly rejected the same claim that perceived “subtle pressure to participate in prayers that violate their beliefs in order to please the board members from whom they are about to seek a favorable, ruling” constitutes coercion. 134 S.Ct. at 1825 (plurality opinion). IVferely exposing constituents to prayer they may find offensive is not enough. “[I]n the, general course[,] legislative bodies do not engage in impermissible coercion merely by exposing constituents to prayer they would rather not hear and in which they need not participate.” Id. at 1827.
Nor did the Board’s prayer practice “chastise[] dissenters []or - attempt ] lengthy disquisition on religious dogma.” Id. at 1826. Rather, as illustrated above, the prayer content largely followed the spirit-, of solemn, respectful prayer approved in Marsh and Town of Greece. Moreover, the record shows that both attendance and participation in the invocations were voluntary. The Board has represented without .contradiction that *321 members of the public were free “to remain seated or to otherwise disregard the Invocation in a manner that [was] not disruptive.” J.A. 277. Thus, as a practical matter, citizens attending a Board meeting who found the prayers objectionable were not without recourse; they could arrive after the invocation, leave for the duration of the prayer, or remain for the prayer without participating, just like the audiences in Marsh and Town of Greece. To the extent individuals like Plaintiffs elected to stay, “their quiet acquiescence [would] not, in light of our' traditions, be interpreted as an agreement with the words or ideas expressed.” Town of Greece, 134 S.Ct. at 1827 (plurality opinion).
By suggesting that audience members should not be required to arrive “after the prayer, leave the room before the prayer, or simply stay seated” because doing so “served only to marginalize,” Majority Op. 288, the majority .rejects the precise actions the Supreme Court approved in Town of Greece, 134 S.Ct. at 1827 (plurality opinion) (“Nothing in the record suggests that members of .the public are dissuaded from leaving the meeting room during the prayer, arriving late, or even, as happened here, making a later protest. In this case, as in Marsh, board members and constituents are free to enter and leave with little comment and for any number of reasons. Should nonbelievers choose to exit the room during ,a prayer they find distasteful, their absence-will not stand out as disrespectful or even noteworthy. And should they remain, their quiet acquiescence will not, in light of our traditions, be interpreted as an agreement with the words or ideas expressed. Neither choice represents an unconstitutional imposition as to mature adults[.]”).
The record is similarly devoid of evidence that anyone who chose .not to participate during the prayer suffered adverse consequences, that their absence was perceived .as disrespectful or was recognized by the Board in any way. To the contrary, the Board has attested, again without contradiction, that such conduct , would have “no impact on [the constituent’s] right to fully participate in the public meeting, including addressing the. commission and participating in.the agenda items-in the same manner as permitted.any citizen of Rowan County.” J.A. 277. Plaintiffs point us to no evidence to the, contrary. Thus, it is implausible on this record to suggest that Plaintiffs were “in a fair and real sense” coerced to participate in the exercise of legislative prayer. Lee, 505 U.S. at 586, 112 S.Ct. 2649. In short,, there’s no evidence .that “town leaders allocated benefits and burdens based on participation in the prayer, or that citizens were received differently depending on whether they joined the.invocation or quietly declined.” Town of Greece, 134 S.Ct. at 1826 (plurality opinion).
As it must do given the record, the majority concedes that it is not “suggesting] that .the commissioners made decisions based on whether an attendee participated in the prayers.” Majority Op. 288. Nonetheless, the majority divines constitutional jeopardy in the juxtaposition of ceremonial prayer immediately prior to Board business. See Majority Op. 288. That distinction lacks meaning given that legislative prayer is a ceremonial prayer practice that occurs at the start of a legislative meeting where a legislative body presumably -intends to engage in legislative work. More to the point, Rowan County’s meeting process is precisely that approved by the Supreme Court in Town of Greece. 134 S.Ct. at 1823 (“The relevant constraint derives from [the prayer’s] place at the opening of - legislative sessions, where it is meant to lend gravity to the occasion and *322 reflect values long part of the Nation’s heritage.”).
Significantly, at no time did the Supreme Court in Town of Greece suggest that legislative prayers at a local government meeting inherently presented any constitutional issue. Yet the innate qualities of local government meetings are where the majority directs its concerns. E.g., Majority Op. 287 (“[T]he intimate setting of a municipal board meeting presents a heightened potential for coercion.”); Majority Op. 288 (“[T]he commissioners consider[] citizen petitions shortly after the invocation,” and “the Board exercises both legislative authority over questions of general public importance as well as a quasi-adjudicatory power over such granular issues as zoning petitions, permit applications, and contract awards.”); Majority Op. 288 (“[T]he intimacy of a town board meeting may push attendees to participate in the prayer practice in order to avoid the community’s disapproval.”). If any of these inherent characteristics conflicted with the First Amendment, it would have been addressed in the Supreme Court’s decision in Town of Greece because those circumstances were squarely part of that case and those arguments were made to the Court. But the Supreme Court rejected those claims, and the majority plainly errs by rejecting the course laid out by the Supreme Court.
Drawing on distinctions noted in Justice Alito’s concurring and Justice Kagan’s dissenting opinions in Town of Greece, the majority also cobbles together a distinction between prayers offered before the totality of a local governmental meeting and those said before a legislative portion of the meeting as distinct from an adjudicatory phase of the meeting. Majority Op. 287-88. But the majority in Town of Greece relied on no such demarcation. The only relevant point in terms of order was that legislative prayer has historically been offered—as it was in Marsh and Town of Greece—at the “opening of legislative sessions, where it is meant to lend gravity to the occasion and reflect values long part of the Nation’s heritage” and “invite[] lawmakers to reflect upon shared ideals and common ends before they embark on the fractious business of governing.” Town of Greece, 134 S.Ct. at 1823. The legislative prayers here similarly occur- at the opening of the Board’s meeting as part of the ceremonial part of the meeting that also includes the Pledge of Allegiance. It occurs before any Board business, whether adjudicative or legislative. The majority’s quibble finds no support in Town of Greece’s holding.
Because the Supreme Court has already rejected the concerns about the intimacy of legislative prayer before a local government meeting, that factor has no bearing on the constitutionality of Rowan County’s practice. But the equally troubling result is that the rest of the majority’s analysis applies with the same force to local, state, and federal legislatures. It will no doubt come as a surprise to members of the United' States House of Representatives and Senate to learn that neither Marsh nor Town of Greece protect their right to offer legislative prayer.
IV.
Make no mistake, while the majority purports to have no problem with the idea of lawmaker-led legislative prayer in the abstract, its reasoning actually leaves no room for lawmakers to engage in the full panoply of legislative prayer practices to which Town of Greece grants constitutional protection. The lawmaker’s mere status as a prayer giver is viewed with immediate skepticism, and any sectarian content to his or her prayers is deemed to have an added coercive effect. Moreover, the ma *323 jority refrains from providing any guidelines as to when, if ever, lawmaker-led legislative prayers can meet their newly minted constitutional standards. Majority Op. 288-89. Indeed, the only safe practice for lawmakers who want to offer a legislative prayer is to ignore what Marsh and Town of Greece permit and offer only a generic prayer to a generic god.
The Rowan County legislative prayer practice falls within the historical traditions recognized in Marsh and Town of Greece and the principles the Supreme Court articulated in both cases. It is constitutional.
For all these reasons, I would reverse the district court’s judgment and enter final judgment for Rowan County. I respectfully dissent.

. At times, this opinion parallels language used in the, now-withdrawn panel majority opinion. Lund v. Rowan Cty., 837 F.3d 407 (4th Cir. 2016), reh’g en banc granted, 670 Fed.Appx. 106 (4th Cir. 2016).

. The record does not reflect that the Board adopted a written policy regarding the invocations, but it followed a relatively routine practice.

. This opinion omits internal marks, alterations, citations, emphasis, and footnotes from quotations unless otherwise noted.

. For example, the majority relies on Engel v. Vitale, 370 U.S. 421, 82 S.Ct. 1261, 8 L.Ed.2d 601 (1962) (striking down structured prayers in public schools), for several general principles regarding why government should not become too affiliated with any religion. Majority Op. 286. These principles are valid insofar as they go. But taken at face value, they would also lead to the conclusion that sectarian legislative prayers violate the Establishment Clause. See McCreary Cty. v. ACLU, 545 U.S. 844, 859 n.10, 125 S.Ct. 2722, 162 L.Ed.2d 729 (2005) (citing Marsh as an example of a permissible governmental action whose "manifest purpose was presumably religious”). Because Marsh and Town of Greece demand otherwise, their principles in this particular context must govern instead.

. Neither Marsh nor Town of Greece specifically put into issue lawmaker-led legislative prayers as their focus was the issue of legislative prayer as a whole. That said, the record in Town of Greece shows that on at least one occasion a councilman offered a prayer during the ceremonial opening. See Joint Appendix, Town of Greece v. Galloway, 134 S.Ct. 1811 (2014) (No. 12-696), 2013 U.S. S. Ct. Briefs LEXIS 3132, at *62-63.

. The majority also, conjures up the "risk of political division” arising from alleged conflicts concerning the Board’s prayer practice. Majority Op. 282. But neither audience-initiated criticism of those-who object.to. a prayer practice nor election-oriented policy statements by Board candidates' are relevant to the issue of law before, the Court, Questions concerning the wisdom of the practice of legislative prayer can be rightly debated in many squares, but the judiciary is not one of them. The Court’s task is solely to decide whether the Board’s practice is lawful under the First Amendment, not whether it is popular or wise.